UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRAD G. DUMONT,

        Plaintiff,                            Case No. 05-CV-70663

vs.

                                          HONORABLE GEORGE CARAM STEEH
                                          HONORABLE STEVEN D. PEPE

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION**

**I.    BACKGROUND**

Brad G. Dumont brought this action under 42 U.S.C. § 405(g) to challenge a final decision of the Commissioner denying his application for Social Security disability benefits. For the reasons stated below IT IS RECOMMENDED that Defendant's motion be GRANTED and Plaintiff's motion be DENIED.

**A. PROCEDURAL HISTORY**

Plaintiff, who was born on July 9, 1969, applied for Disability Insurance Benefits on November 27, 2001, claiming disability as of April 15, 1999 (R. 18, 24). After Plaintiff's application was initially denied, he had a November 17, 2003, hearing before administrative law judge (ALJ) John A. Ransom who issued a decision on March 23, 2004, finding Plaintiff to be disabled (R. 266, 18 - 26). On December 22, 2004, the Appeals Council denied Plaintiff's request for review (R. 6).

**B. BACKGROUND FACTS**

1

### 1. PLAINTIFF'S HEARING TESTIMONY

At his hearing on May 7, 2002, Plaintiff stated that he did not graduate from high school, being one-half credit short of graduating. Plaintiff attended a junior college, which accepted him because he was a wrestler. Plaintiff did not obtain an Associates Degree (R. 270 - 271). Plaintiff testified that he was six feet and two inches tall, weighed two hundred and forty pounds, which was about 50 pounds lighter than his normal weight (R. 289). At the hearing, Plaintiff modified his disability onset date was June 15, 2000, when he was hospitalized for a gallbladder infection and doctors removed his gallbladder (R. 270 - 272). Plaintiff claims that he has "zero feeling left" all the way up to his buttocks (R. 274). Plaintiff explained that he has nerve pain throughout his body:

> It shoots around my body. It's indescribable. I can't pinpoint it. It'll go one second in the top of my foot, the next minute in my shoulder, run down my back, hit me in the knee. It just – it's never in the same spot, and it just runs – like electric will run through my body. It just zaps me wherever it can.

(R. 275).

Plaintiff is diabetic having been diagnosed as such when he was 14 years old (R. 276). Plaintiff used to drink alcohol heavily, but had not had any in the last 5 years. He smokes half a pack of cigarettes a day, and "occasionally" smokes marijuana (R. 277 - 278). Plaintiff has several problems with his feet, that result in significant pain, including the tips of his toes growing big hunks of skin; the top of his right foot turning black; toenails that are thick, jagged and falling off; and calluses over the top of his feet (R. 279 - 280). Plaintiff was not currently being treated for his feet problems but sometimes wears a diabetic walking cast on his right foot and leg. (R. 279, 287). Plaintiff also suffers from arthritis and carpel tunnel in his hands. (R. 288).

Plaintiff has been given several explanations for abdominal pain and vomiting, but his doctors generally believe that it is a result of his diabetes. The medication that Plaintiff has taken for his abdominal pain and vomiting has not been helpful (R. 280 - 281). Plaintiff has also suffered from blackouts and dizziness over the last 8 months (R. 285 - 286).[1]

Plaintiff has stopped taking some of his medication, apparently against his doctors' orders, because they made him "feel like I was dead" (R. 286). Plaintiff has taken Reglan, Neurontin and morphine. At the time of the hearing, Plaintiff was taking Xanax and Glucotrol (R. 286).

Plaintiff says that in the morning he is in great pain. "Every joint, every muscle, every inch of my body feels like a bus ran over me. I pop, snap, crack, ache, throb. It's just unbearable at times, unbearable" (R. 283). Plaintiff recounted that he does not read, watches very little TV, and spends much of his time lying in bed (about three hours a day) and sleeping because he is always very tired. Other then that, Plaintiff states that he does "nothing" all day (Id.). Plaintiff has three children (aged eight, five and two) and that his two year old stays at home with him, his father-in-law and his brother-in-law, while his wife is at work and the other two kids are at school. Plaintiff stated that he does not help with any of the household chores. (R. 284).

### 2. MEDICAL EVIDENCE

#### Medical Evidence Submitted Prior ALJ Ransom's Hearing

---

[1] "It feels like I'm moving my head way back, like, shaking it, like, back and forth really fast. I get shadows and patterns, and I just – yeah, I don't feel comfortable with the view that I'm getting" (R. 286).

Chest x-rays taken by Dr. Garry Rudder on November 3, 1998, and left foot x-rays taken by Jeffery Mitchinson on August 18, 1998, revealed a normal appearing chest, and a left foot that showed no evidence of fracture (R. 179 - 180).

Plaintiff's medical evidence includes medical records that are dated November 3, 1998, through November 13, 1998; June 7, 2000, through June 17, 2000; and April 26, 2001, through June 21, 2001 (R. 104 - 120).  Most of the notes are illegible.  A note dated with an illegible month but with a date sometime in 2000 indicates that Plaintiff had a fever for two days, loose stools and pain everywhere (R. 110).  On July 17, 2000, Plaintiff reported that his headaches were better but that he has been suffering from depression and has had some suicidal ideation.  A note dated August 3, 2000, indicates that Plaintiff had an episode of headache, fatigue and nausea (R. 112).  The note dated October 4, 2000, states that Plaintiff had stopped working in order to deal with his health.  Plaintiff reported good control of his diabetes, but a weight loss of ten pounds (down to 232 pounds) and vomiting every morning (R. 111).  The note also suggests that Plaintiff had gastroparesis.  In terms of medications, it indicates that Plaintiff had probably taken Reglan before.  He had not taken Zoloft, but the doctor suggested that Plaintiff was probably abusing cannabis earlier but that Plaintiff had now given it up (Id.).

On January 21, 2001, Dr. James R. Weeks, Jr. examined Plaintiff's left hip after Plaintiff suffered from five months of hip pain with difficulty abducting and adducting.  Dr. Weeks found no evidence of fracture dislocation or bone destruction (R. 187).

On April 27, 2001, Plaintiff's serum amalyse was 140 (R. 127).  On June 29, another laboratory study revealed a serum amalyse of 238, which was high (a normal reading fell between 0-100).  Presumably as a result of this high reading, someone had written on the form,

"call pt. & have him go to ER!!" (R. 124).

On June 26, 2001, an abdominal ultrasound gave indications of elevated amylase, diabetes and ethanol abuse (R. 122). The findings from the ultrasound revealed multiple small gallstones in an otherwise normal-appearing gall bladder. Plaintiff's liver, common duct, pancreas, both of his kidneys and spleen were all described as "grossly normal" (Id.). Dr. Keith G. Winterkorn, M.D., who reviewed this study, pointed out that the study showed no evidence of change at, or adjacent to, Plaintiff's pancreas (Id.).

On June 28, 2001, Plaintiff saw Darlo G. Vander Wilt, DPM (Doctor of Podiatric Medicine) for diabetic related foot complications (R. 172). Dr. Vander Wilt noted that Plaintiff's problems were exacerbated by wearing shoes and he warned that this condition, if left unattended, could result in limitation of ambulation. Dr. Vander Wilt removed the necrotic tissues from the infected toenails, advised Plaintiff about the buying and fitting of appropriate footgear, and asked him to return in one week (Id.).

Plaintiff had his gall bladder removed by Dr. Gregory Richardson, on July 3, 2001 (R. 136). Prior to surgery, Dr. Richardson noted that Plaintiff had a amylase reading of 174 and had hematuria (R. 138). Dr. Richardson indicated that he performed the surgery only after it was assured that Plaintiff's amylase was returning towards normal (R. 135). After the procedure, Plaintiff stayed in the hospital until July 8, 2001, due to continuous episodic abdominal pain. Dr. Richardson noted that it was unclear whether this abdominal pain was related to the surgical procedure or continuing pancreatitis. When his abdominal complaints improved and could be controlled with oral medications, Dr. Richardson discharged Plaintiff. Dr. Richardson planned to follow Plaintiff for mild diabetes that could "hopefully" be treated with diet and oral medications

(Id.).

Plaintiff apparently did not return to see the podiatrist, Dr. Vander Wilt, until August 8, 2001 (R. 171). Dr. Vander Wilt found evidence of ulceration on Plaintiff's right foot and removed the diseased tissue. He prescribed Neurontin and again advised Plaintiff to return in one week (Id.). On August 22, 2001, Dr. Vander Wilt described Plaintiff's problem as a 100% granular non-painful and improving neuropathic ulcer (R. 170). On August 29, 2001, Dr. Vander Wilt further diagnosed Plaintiff with uncontrolled diabetes mellitus, type I with neurological manifestations (R. 168). On October 3, 2001, Dr. Vander Wilt reported improvement (R. 169).

On September 27, 2001, Plaintiff saw Dr. Gary Siebel at Gerald Campion Regional Medical Center Emergency Department, complaining of right foot pain and swelling. Dr. Siebel diagnosed plaintiff with Diabetes Mellitus, Type II, and prescribed Augmentin tablets. (R. 174).

On December 19, 2001, Plaintiff had a high amylase reading of 150. On December 21, 2001, Plaintiff saw Merrilee R. Brandt, M.D., for complaints of pancreatitis (R. 175-76). Although he reported an 80 pound weight loss in the past six months, Dr. Brandt described Plaintiff as slightly overweight at 230 pounds (R. 176). Dr. Brandt noted that Plaintiff had not had a work up for six months. Therefore, she ordered a CT scan of his abdomen as she had opined that the weight loss may be due to a pancreatic pseudocyst or pancreatic duct stenosis. Dr. Brandt gave Plaintiff medication for his pancreas and a prescription for his nausea and vomiting (Id.). The CT scan, however, showed a normal appearing abdomen (liver, spleen, pancreas, both adrenal glands and both kidneys are normal in appearance) (R. 177). Other tests, on December 20, 2001, showed that Plaintiff's legs had a normal arterial flow (R. 178).

A January 10, 2002, exam of the lumbosacral spine showed degenerative changes of the lower thoracic and upper lumbar region with osteoarthritic changes at L5/S1 (R. 186). On January 11, 2002, an MRI scan of Plaintiff's abdomen showed that his pancreas was morphologically normal (R. 181). Overall, the MRI produced no obvious bilary duct abnormality (Id.). On January 15, 2002, Medley A. Larkin, D.O., noted: Gastroparesis; glucose intolerance and a history of insulin dependent diabetes mellitus; diabetic enteropathy; history of diverticulosis/diverticulitis; history of gallstones and pancreatitis; and S/P cholecystectomy. Plaintiff's pancreas appeared to be normal and Dr. Larkin took him off of his pancreatic enzymes (R. 184). An exam of the abdomen on January 20, 2002, showed a large amount of retained stool, status post cholecystectomy and some increased density in both hips (although this may be "artifactual" and his films were suggested) (R. 185). On January 25, 2002, and February 28, 2002, Plaintiff's Amylase reading was within the normal range at 97 and 82, respectively. (R. 208, 206).

Dr. Brandt referred Plaintiff to Michael D. Papenfuse, D.O., who saw Plaintiff on May 22, 2002 (R. 222-23). Dr. Papenfuse noted that Plaintiff was taking two medications, Neurontin and Zonegran. Dr. Papenfuse did not understand this medication regimen and advised Plaintiff to discontinue Neurontin and escalate the dosage of Zonegran. Dr. Papenfuse also opined that some factors in Plaintiff's lumbosacral spine might be the cause of the abdominal pain. Thus, he ordered an MRI of the lumbar spine. Dr. Papenfuse noted that Plaintiff has been on multiple antibiotics in the past and has been susceptible to yeast infections as well. Dr. Papenfuse wished to start Plaintiff on an oral Diflucan therapy, pending liver function studies, and started him on Acidopiles and Bifidobactor supplements to try to improve his gastric flora (R. 222). Dr.

Papenfuse's diagnosis was: chronic abdominal pain, secondary to autonomic neuropathy, diabetic gastroparesis; diagnosed diabetes mellitus times 17 years; history of diverticulitis; diabetic peripheral neuropathy; and smoker and occasional marijuana user (R. 219). Yet, on June 12, 2002, Dr. Papenfuse reviewed the MRI results and said, "I definitely disagree with the report of the MRI" (R. 214).[2] Plaintiff had not been able to increase his dosage of Zonegran, nor had he been able to obtain Duragesic patches, due to insurance problems. On physical examination, Dr. Papenfuse described Plaintiff as weighing 239 pounds and walking with a normal gait. He had no paraspinal muscle spasms in his back and he had negative straight leg raising tests. He did have some mild midline tenderness in the upper part of the lower thoracic area. Plaintiff also had some weakness, particularly to hip flexion on the left side at the L2 nerve root level. Dr. Papenfuse noted that Plaintiff had left groin and left lower extremity pain, secondary to spinal degenerative disk disease with probable radicular symptoms into the left lower extremity, possibly affecting primarily the left L2 nerve root; diabetic polyneuropathy; and chronic abdominal pain with gastroparesis and frequent nausea and vomiting with possible chronic yeast infection (Id.).

On January 7, 2003, Plaintiff saw Dr. Erik-Jan Wamsteker, at the University of Michigan. Plaintiff told Dr. Wamsteker that he suffered from chronic epigastric pain, nausea, has alternating constipation and diarrhea, irritable bowel syndrome and fibromyalgia. Plaintiff stated that his diabetes was well controlled. Plaintiff further reported headaches, constipation, carpal tunnel syndrom and anxiety (R. 228). Dr. Wamsteker opined that Plaintiff's problems

---

[2] Although, Dr. Papenfuse did not make clear the findings with which he disagreed (R. 214).

were most likely related to complications of diabetes (R. 229). Dr. Wamsteker also wanted to examine Plaintiff's pancreas in more detail to see if he had chronic pancreatitis. If he did, then Dr. Wamsteker suggested treatment with pancreatic enzyme supplementation (Id.).

Eleven months later, on December 4, 2003, Plaintiff saw Dr. Ravi Lakkaraju, for an EMG (R. 231). Dr. Lakkaraju noted that Plaintiff presented with various vague symptoms, primarily numbness in his legs and arms. However, his muscle strength was 5/5, his range of motion was within full limits and his muscle bulk was normal. The EMG revealed evidence of mild carpal tunnel syndrome bilaterally with no axonal loss. There was no evidence of polyneuropathy at the upper extremities, although there was distally at lower extremities. The study also showed no evidence of lumbar radiculopathy or plexopathy (Id.).

**Medical Evidence Submitted to the Appeals Council After ALJ Ransom's Hearing**

Plaintiff saw Dr. Sylvia Boloczko, four times between January 16, 2004, and February 25, 2004 (R. 237 - 242). On January 16, 2004, Dr. Boloczoko noted that Plaintiff suffered from: diabetes melitus, diabetic neuropathy, chronic foot ulcers, infections and osteomyelitis, pancreatitis, fibromyalgia and degenerative joint disease (R. 241). X-rays taken on February 10, 2004, showed no significant abnormality of the hips and some straightening of the cervical spine on the lateral projection, probably the result of a muscle spasm (R. 247 - 249). On February 12, 2004, Plaintiff returned to discuss some lab work and complained of nausea, vomiting and epigastric abdominal pain. Dr. Boloczoko diagnosed him with Diabetes with microalbuminuria, hyperlipidemia and epigastric pain with nausea, vomiting and possible pancreitis (R. 238).

### 4. VOCATIONAL EVIDENCE

Ms. Pauline McEachin, a vocational rehabilitation counselor, testified as the vocational

expert (VE) (R. 290). ALJ Ransom posed a hypothetical question, asking about a younger individual, with the same educational and work background as Plaintiff and with the same limitations and impairments that Plaintiff has testified to. VE McEachin stated that Plaintiff could not perform any of his past work, due to his need to lie down for approximately three hours each day (R. 291).

ALJ Ransom then proposed a second hypothetical, stating that this person would be limited to lighter sedentary work and would also require a sit/stand option. This person could not do any repetitive bending, twisting, turning, pushing or pulling, gripping or grasping and would be totally prohibited from crawling, squatting, kneeling or climbing (Id.). In response to those

factors, the vocational expert testified that the person described in the hypothetical question could perform the following light and sedentary work:

> 1,700 information clerk (light)
> 2,200 visual inspector (light)
> 8,000 cashier (light)
> 1,300 sorter (light)
> 1,200 information clerk (sedentary)
> 1,100 identification clerk
> 2,200 visual inspector
> 2,000 video surveillance monitor

R. 291-92.

Ms. McEachin affirmed that her testimony about those jobs conformed with the information contained in the Dictionary of Occupational Titles (DOT) (R. 292).

### 5. THE ALJ'S DECISION

ALJ Ransom found that Plaintiff had not engaged in any substantial gainful activity since

the alleged onset of disability and that Plaintiff suffers from severe impairments including: "degenerative disc disease, diabetes, pancreatitis and carpal tunnel syndrome" (R. 25). These impairments did not meet the requirements or equal the level of severity contemplated under any listing included in Appendix 1 to Subpart P, Regulations No. 4 (Id.).

ALJ Ransom also found the Plaintiff's complaints of disabling symptoms and limitations not totally credible (Id.).

ALJ Ransom found Plaintiff to be unable to perform any of his past relevant work and to have the following residual functional capacity: a limited range of unskilled sedentary work with restrictions of a sit/stand option, no repetitive bending, twisting, turning, pushing, pulling, gripping or grasping and no crawling, squatting, kneeling or climbing" (Id.).

ALJ Ransom also found that Plaintiff was in the 'younger' and 'more than a high school education' categories and that Plaintiff "has no transferable skills from semi-skilled work previously performed" (R. 26). Using Medical-Vocational rule 201.28 as a framework for decision-making ALJ Ransom found that even with the Plaintiff's limitations, there are still "a significant number of jobs in the national economy that he could perform." He used the examples of sedentary jobs that VE McEachin identified: "such jobs include work as an information clerk (1200), identification clerk (1100), visual inspector (2200) and video surveillance monitor (2000)" (Id.). Therefore, ALJ Ransom determined that Plaintiff "is not entitled to a period of disability or Disability Insurance Benefits under Sections 216(I) and 223, respectively, of the Social Security Act. (Id.).

## II.     ANALYSIS

### A. STANDARDS OF REVIEW

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry their burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than their past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[3] A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which Plaintiff

---

[3] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

can perform.

### B. FACTUAL ANALYSIS

Plaintiff raises two challenges to the Commissioner's decision that Plaintiff was not disabled under the Social Security Act: (1) ALJ Ransom did not properly consider the testimony of the claimant as to his symptoms of pain, (2) and ALJ Ransom did not consider Plaintiff's asserted need to lie down for several hours during the day as a disabling condition from work. Essentially, these are challenges to ALJ Ransom's credibility findings regarding Plaintiff's degree of pain and his limitations.

Plaintiff first argues that ALJ Ransom "completely disregarded Plaintiff's testimony regarding his pain" (Plaintiff's motion for summary judgment, p. 12). A reading of ALJ Ransom's opinion shows this not to be true. ALJ Ransom acknowledged that: "[i]n making this assessment, the undersigned must consider all symptoms, **including pain**, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 CFR § 404.1529, and Social Security Ruling 96-7p" (R. 20) (emphasis added).

ALJ Ransom goes on to note that Plaintiff testified that he has "pain in the tendons, muscles and joints" (Id.). Having thus acknowledge both the Plaintiff's testimony of experiencing pain and his duty to consider such testimony, ALJ Ransom turns to the medical evidence supplied by Plaintiff and notes several instances where treating physicians observed or noted Plaintiff's experience with pain. For example, he notes that Dr. Papenfuse, diagnosed plaintiff with "chronic abdominal pain" (R. 21). Yet, the medical record does not indicate the this stomach problem has persisted without remission. His major complaints at the hearing were

in his joints and muscles.  But ALJ Ransom noted no verifiable basis for Plaintiff's neurological complaints (Id.) and his treating physicians have not prescribed significant pain medication, pain management, physical therapy or a "TENS unit" (R. 23).

Generally, under 42 U.S.C. § 405(g), the findings of the ALJ are conclusive if they are supported by substantial evidence.  Accordingly, the court's "review is limited to determining whether there is substantial evidence in the record to support the findings." *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 851 (6th Cir. 1986).  The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion and substantial evidence standard presupposes that there is a "zone of choice" within which the Secretary may proceed without interference from the courts.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).  In the end, ALJ Ransom determined that Plaintiff's pain does not rise to a level of disability and that Plaintiff is able to work despite his pain.

Plaintiff also objects what he alleges as the ALJ's failure to include Plaintiff's need to lie down in the hypothetical he set forth for VE McEashin.  Plaintiff's assertion that he needs to lie down for three hours a day is not supported by the record other than his own testimony.  While there are no doctors' directives that laying down is necessary to alleviate pain, these are not necessary.  *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994) stated:

> [t]he only factor weighing against [claimant] is that no doctor of record has stated that she must lie down for long periods of time in order to relieve her pain.  This factor is legally insufficient to support a rejection of Felisky's credibility, as it does not constitute substantial evidence.

While the absence of a Doctor affirming this alleged need to lie down for relief is not sufficient to reject a claimant's credibility, the absence of any reference in the medical record to

14

obtaining such relief can be considered as some relevant evidence. The key question is not whether this provides relief, but whether it is a necessary mode of relief. Here, ALJ Ransom did not find Plaintiff's claims of his daily need to lie down to be credible (R. 23, 25). The regulations provide that the ALJ making a credibility determination must consider the objective medical evidence as well as other factors, such as precipitating and aggravating factors, and daily activities. 20 C.F.R. § 404.1529 (c)(2), (c)(3). An ALJ may consider factors such as statements by a claimant's various physicians; a claimant's own statements throughout the administrative process and the consistency of those statements with the other record evidence; a claimant's use of medication and the side effects of those medications; a claimant's daily activities; and a claimant's course and history of treatment, in addition to a claimant's demeanor/appearance at the hearing. 20 C.F.R. § 404.1529(c)(2)-(c)(3). When the ALJ's credibility finding is adequately explained, it is entitled to deference. *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony"); *Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1234 (6th Cir. 1993); *Williamson v. Secretary of HHS*, 796 F.2d 146, 150 (6th Cir. 1986); *Beavers v. Secretary*, 577 F.2d 383, 386 (6th Cir. 1978). In addition, it is for the Secretary to resolve conflicts in the evidence and to decide questions of credibility. *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987). It is for the Secretary, not a reviewing court, to make credibility findings but if an ALJ rejects a claimant's testimony as not credible, ALJ must clearly state his reasons for doing so. *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994). ALJ Ransom adequately explained why he found Plaintiff not to be credible with regard to his need to lie down for three hours each day:

> Claimant testified that he slept three hours during normal waking hours ... .
> ...[C]laimant testified that his wife was employed and that they had three children,
> ages 8, 5 and 2.  Caring for a two year old child while his wife works represents a
> significant functional capacity. ...  While the claimant undoubtedly may
> experience some pain, limitations and restrictions from his impairments, the
> extent and frequency reported is not fully credible or supported by the objective
> medical evidence of record.

He noted the evidence suggested Plaintiff's diabetes was under control with medication and diet (R. 22).  (ALJ Ransom specifically questioned Plaintiff's credibility in claiming no doctor had placed him on a diabetic diet (R. 22)).  He found that Plaintiff's pancreatis did not result in significant functional limitations.  His degenerative disc disease had no need for surgery, nor did his carpal tunnel syndrom (which did not even need wrist splints) (Id.).

Therefore it is not for this Court to question the ALJ's credibility findings or his ultimate decision to not include that restriction in the VE's hypothetical.

### III.   RECOMMENDATION:

Accordingly, for the above stated reasons IT IS RECOMMENDED that Defendant's motion be GRANTED and Plaintiff's motion be DENIED.

The parties to this action may object to and seek review of this report and recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C.. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985);  *Howard v. Sec'y of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this report and

recommendation. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: January 31, 2006                                s/Steven D. Pepe
Ann Arbor, Michigan                                    UNITED STATES MAGISTRATE JUDGE


Certificate of Service

I hereby certify that a copy of this Report and Recommendation was served upon the attorneys and/or parties of record by electronic means or U. S. Mail on January 31, 2006.

s/William J. Barkholz
Courtroom Deputy Clerk